Motions for Rehearing Overruled and Opinion of December 31, 2002
Withdrawn; Affirmed in Part, Reversed and Remanded in Part, a









 

Motions
for Rehearing Overruled and Opinion of December 31, 2002 Withdrawn; Affirmed in
Part, Reversed and Remanded in Part, and Opinion on Rehearing filed May 29,
2003.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.
14-01-00431-CV

____________

 

JOHN
MCMAHAN, INDIVIDUALLY AND D/B/A J. M. WHOLESALE,
Appellant

 

V.

 

HOWARD
W. GREENWOOD, HOWARD GREENWOOD INVESTMENTS, INC., FINE RIDES, INC., CIRCULAR
PROCESSING, INC., AND 

J. RANDLE HENDERSON,
Appellees

 



 

On
Appeal from the 129th District Court

Harris
County, Texas

Trial
Court Cause No. 98-15020

 



 

O P I N I O N   O N  
R E H E A R I N G

We withdraw our
opinion of December 31, 2002 and issue this opinion on rehearing.  The motions for rehearing filed by appellant
McMahan and appellee Henderson are overruled.

 








John McMahan
appeals from summary judgments granted in favor of Howard Greenwood, Howard
Greenwood Investments, Inc., Fine Rides, Inc., Circular Processing, Inc. (collectively,
Athe
Greenwood defendants@), and J. Randle Henderson in a lawsuit arising out of a
business venture between McMahan and the Greenwood defendants.  McMahan contends the trial court erred in
granting the defendants= motions for summary judgment and in denying McMahan=s
motions for continuance and new trial. 
We affirm in part, reverse in part, and remand for further proceedings.

I.  Factual Background

John McMahan
owned and operated a business refurbishing and selling antique and exotic
automobiles.  By early 1989, his
inventory and equipment were under a lien securing a note held by the FDIC.  In March of 1989, McMahan and Howard
Greenwood began discussions for a business venture dealing in classic cars,
which culminated in the formation of Fine Rides, Inc. in April of 1989.  Greenwood was to provide financing and
perform certain business functions, including financial management and
accounting, while McMahan was to sell and service the cars and serve as company
president.  Although, initially Greenwood
was to be the sole shareholder of Fine Rides, the parties signed a stock option
agreement which provided that as part of his compensation, McMahan had an
option to purchase 70% of the company=s stock in exchange for his contribution of certain
assets.   The agreement provided that
McMahan=s
stock option could be exercised at any time beginning April 1, 1989.  Henderson, an attorney, drafted the
incorporation documents and the Stock Option Agreement. 








In order to
free McMahan=s assets from the FDIC lien, Fine Rides purchased McMahan=s
notes from the FDIC. Although McMahan contends he contributed approximately
$750,000 in cash and assets to Fine Rides and that he was told by Henderson he
was a shareholder, no stock certificates were ever issued to him.  The summary judgment evidence reflected that
the assets McMahan contributed to Fine Rides were originally recorded in the
company=s
accounting records as contributions toward stock ownership, but were later Areversed@
in March or April of 1991.  The parties
dispute who ordered the reversals and the reasons for the reversals.[1]  In 1993, Fine Rides sold the service portion
of its business to McMahan.  As part of
this transaction, McMahan purchased much of the inventory that he had earlier Acontributed@
to Fine Rides.  The purchase price was
incorporated into a promissory note for $173,356.53 from McMahan to Fine Rides,
Inc.    By 1994, the business and personal
relationships between McMahan and Greenwood had deteriorated
significantly.  On March 30, 1994, the
parties entered into a settlement agreement to resolve Aall
matters between [the] parties including the division of assets, release of
claims and/or liens against assets, the resolution of ownership of shares of
stock in Fine Rides, Inc. and the resolution of any causes of action . . . .@  In the agreement, McMahan released any
claim  to stock ownership in Fine Rides
in return for receiving certain property and rights.  The agreement also contained the following
language wherein each party agreed to release the other:

from any and all claims,
demands, damages, actions, causes of actions or suits in equity of whatsoever
kind or nature whether heretofore or hereafter accruing or whether now known or
not known to the parties for or because of any matter or thing done, omitted or
suffered to be done by either of such parties prior to and including the date
hereof and in any way directly or indirectly arising out of the business
relationship between the parties.

 








In September of
1996, McMahan requested information from Henderson that would allow him to take
tax credits related to losses he sustained in Fine Rides.  In response, Henderson stated in a letter
that McMahan had never owned any stock in Fine Rides and therefore was not
entitled to an IRS Form K-1 from Fine Rides. 
McMahan claims he did not discover that he was not a shareholder until
he received Henderson=s letter.  He further
alleges he did not discover until August of 2000 that the accounting entries
for the assets he had contributed to the company had been reversed in
1991.  He contends the reversal
essentially made the transfer of assets a loan from him to the company rather
than a contribution toward stock ownership in accordance with the Stock Option
Agreement.

McMahan filed
suit against Henderson and the Greenwood defendants alleging fraud, fraudulent
inducement, breach of fiduciary duty, breach of contract, conspiracy,
conversion, concert of action and legal malpractice.  He also pleaded duress and breach of
conditions precedent.  As damages for the
alleged fraud, McMahan sought recovery of the contributions he claims were
fraudulently obtained or the value of the tax credits he contends he would have
been entitled to receive as a shareholder in the company.  The defendants pleaded numerous affirmative
defenses including release, ratification, and limitations.  Henderson moved for summary judgment on both
traditional and no-evidence grounds.  The
Greenwood defendants also filed a traditional and no-evidence summary judgment
motion.  Without specifying any grounds,
the trial court granted summary judgments in favor of the Greenwood defendants
and Henderson.

II.  Standards of Review








Because
the court=s summary judgment orders do not
specify the ground or grounds upon which they were granted, we uphold the court=s judgment if properly supported by
any ground alleged in the motions. 
See Carr v. Brasher, 776 S.W.2d 567, 569 (Tex. 1989).  As noted, both motions for summary judgment
alleged traditional and no-evidence grounds. 
Under a traditional ground for summary judgment, the movant has the
burden of proving that no genuine issue of material fact exists and that he is
entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a; Nixon
v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985).  A defendant as movant for summary judgment
must conclusively negate at least one essential element of the plaintiff=s cause of action or conclusively
establish each element of an affirmative defense.  Castillo v. Westwood Furniture, Inc.,
25 S.W.3d 858, 860 (Tex. App.CHouston [14th Dist.] 2000, no pet.).  If the movant=s motion and summary judgment proof
establish a right to judgment as a matter of law, the burden then shifts to the
non‑movant to raise a material fact issue sufficient to defeat summary
judgment.  Id.  In deciding whether a disputed material fact
issue precluding summary judgment exists, we resolve every reasonable inference
in favor of the non‑movant and all evidence favorable to him will be
taken as true.  Nixon, 690 S.W.2d
at 548B49; Castillo, 25 S.W.3d at
860.

In a
no-evidence summary judgment ground, the movant asserts that there is no
evidence of one or more essential elements of claims upon which the opposing
party would have the burden of proof at trial. 
Tex. R. Civ. P. 166a(I); Lake Charles Harbor
& Terminal Dist. v. Bd. of Trs. of the Galveston Wharves, 62 S.W.3d
237, 241 (Tex. App.CHouston [14th Dist.] 2001, pet. denied).  A
no-evidence summary judgment should be sustained if: (1) there is a complete
absence of proof of a vital fact; (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence conclusively establishes the opposite of a vital
fact.  Dagley v. Haag Eng=g
Co., 18 S.W.3d 787, 793 (Tex. App.CHouston [14th Dist.] 2000, no pet.).  Less
than a scintilla of evidence exists when the evidence is so weak as to do no
more than create a mere surmise or suspicion of a fact.  Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla
of evidence exists when the evidence rises to a level that would enable
reasonable and fair‑minded people to differ in their conclusions. 
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997).  In
reviewing a no-evidence summary judgment, we examine the evidence in the light
most favorable to the nonmovant and disregard all evidence and inferences to
the contrary.  Blan v. Ali, 7
S.W.3d 741, 747 (Tex.
App.CHouston [14th Dist.] 1999, no pet.).








III.  The Greenwood Defendants

A.  The Release

 

In their motion
for summary judgment, the Greenwood defendants argued that the release language
in the 1994 settlement agreement precludes all of McMahan=s
claims except for breach of the settlement agreement itself.  A release, valid on its face, is, until set
aside, a complete bar to any action based on matters covered in the
release.  Deer Creek Ltd. v. N. Am.
Mortgage Co., 792 S.W.2d 198, 201 (Tex. App.CDallas 1990, no
writ).  In a summary judgment context,
once a release is properly pleaded, the burden shifts to the other party to
offer proof that the release should be set aside.  See Sweeney v. Taco Bell, Inc., 824 S.W.2d
289, 291 (Tex. App.CFort Worth 1992, writ denied); Deer Creek Ltd., 792 S.W.2d
at 201.  The Greenwood defendants
asserted the affirmative defense of release based on the terms of the
settlement agreement which, on its face, released all claims between the
parties relating to stock ownership in Fine Rides.

In attempting
to defeat application of the release, McMahan raised three grounds of avoidance:
(1) rescission based on fraudulent inducement; (2) duress; and (3) a failure of
conditions precedent.  We examine each of
these arguments in turn and conclude that McMahan has failed to meet his burden
of proof.

1.  Fraudulent Inducement








McMahan first
contends the settlement agreement should be rescinded or voided because his
consent was fraudulently induced.  Texas
law has long imposed a duty to abstain from inducing another to enter into a
contract through the use of fraudulent misrepresentations.  See Haase v. Glazner, 62 S.W.3d
795, 798 (Tex. 2001).  Fraud and
fraudulent inducement require proof of a material misrepresentation that (1)
was false; (2) was either known to be false when made or was asserted
recklessly without knowledge of the truth and as an affirmative assertion; (3)
was intended to be acted upon; (4) was relied upon; and (5) caused injury.  Fletcher v. Edwards, 26 S.W.3d 66, 77 (Tex. App.CWaco
2000, pet. denied) (citing Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667,
674 (Tex.1998)).

McMahan
contends he was fraudulently induced to sign the agreement because (1) the
Greenwood defendants represented to him that he was a shareholder in Fine
Rides  then failed to disclose that he
was not in fact a shareholder before he signed the settlement agreement; and
(2) the accounting entries showing he had contributed certain assets toward his
stock option were reversed.[2]  We discuss each in turn.

a.  Stock Ownership Representations

McMahan claims
that appellees made fraudulent misrepresentations to induce him to contribute
assets to Fine Rides.  In exchange for
his contributions, McMahan contends he was to receive 70% of the stock in Fine
Rides, which he never received. McMahan further maintains he was told he was a
shareholder of the company and that issuance of stock certificates was simply a
formality.  Regarding the settlement
agreement, McMahan specifically argues that the Greenwood defendants failed to
disclose their prior fraudulent conduct, thus fraudulently inducing him to sign
the agreement under the misimpression that he had been the majority
shareholder.

In their motion
for summary judgment, the Greenwood defendants argued that the summary judgment
proof conclusively established McMahan knew he was not a shareholder of Fine
Rides and, consequently, could not now claim that he relied on the alleged
misrepresentations.  McMahan=s
claim that he relied on the alleged misrepresentations cannot stand if he can
be legally charged with knowledge of the true facts.  See Shindler v. Mid-Continent Life Ins.
Co., 768 S.W.2d 331, 334 (Tex. App.CHouston [14th Dist.] 1989, no writ) (citing Sutton v. Grogan
Supply Co., 477 S.W.2d 930, 935 (Tex. Civ. App.CTexarkana
1972, no writ).  








The Greenwood
defendants attached to their motion for summary judgment an affidavit from
Henderson, the attorney who represented them in the negotiations culminating in
the settlement agreement.  In his
affidavit, Henderson stated that during the settlement negotiations he told
three different attorneys representing McMahan that it was the Greenwood
defendants= position that McMahan was not a shareholder in Fine Rides, had
never been a shareholder in Fine Rides, and was merely the owner of an
unexercised stock option.  Henderson
further stated that McMahan=s claim of stock ownership was definitely part of the
negotiations and that one of McMahan=s attorneys agreed to the language in the settlement agreement
covering that issue, i.e., AMcMahan will release any claim he has to the ownership of stock
of Fine Rides, Inc.@

In response,
McMahan argues that one of the attorneys listed by Henderson did not actually
represent him because of a conflict of interest and that the statements in the
affidavit do not prove McMahan had actual knowledge of the Greenwood defendants=
position.  We find these arguments
without merit.  The fact that one of the
attorneys eventually declined representation does not harm the reliability of
Henderson=s affidavit.  Further,
the test is not simply whether McMahan had actual knowledge, but whether he
could be charged with such knowledge as a matter of law.  See Shindler, 768 S.W.2d
at 334.

In determining
whether McMahan can be charged with knowledge, we examine the reliability of
the statements in Henderson=s affidavit.  Testimonial
statements by an interested witness may be the basis for a summary judgment
when the statements are clear, positive, and direct, are otherwise credible and
free from contradiction and inconsistency, and could have been readily controverted.  Tex.
R. Civ. P. 166a(c); Casso v. Brand, 776 S.W.2d
551, 558 (Tex. 1989). 








We find the
statements in Henderson=s affidavit to be clear, positive, and direct.  The statements include specific details as to
the time, place, and subject matter of the conversations between Henderson  and the attorneys representing McMahan.  We also find the statements are otherwise credible
and free from contradiction and inconsistency, particularly given that McMahan
does not argue, and the record does not reflect, any express exercise of the
stock option.[3]  McMahan seems to be of the opinion that the
stock option was self-exercising once he made sufficient contributions, but
nothing in the parties= contract or the record supports that position.  Indeed, the Stock Option Agreement required
the contribution of assets by McMahan Aas shall be acceptable to the Company=s
Board of Directors.@  McMahan does not refer
to any evidence in the record demonstrating the board=s
acceptance of his contributions.  The
statement in the settlement agreement that McMahan Awill
release any claim@ further bolsters Henderson=s averments.  If McMahan
was indeed considered a shareholder of Fine Rides then it would have been more
logical to state that he released or conveyed his shareholder interests rather
than stating that he Awill release any claim@ to stock ownership. 
Finally, we find Henderson=s statements could have been readily controverted.  McMahan could have provided affidavits from
his former attorneys denying the alleged conversations, or stating that although
the conversations occurred, the information was not conveyed to McMahan,
assuming such statements were true.








Because
Henderson=s affidavit meets the requirements of Rule 166a(c) and McMahan
has not controverted the statements in the affidavit, we find the summary
judgment proof conclusively establishes that McMahan=s
attorneys were aware that he was not a shareholder of Fine Rides, had never
been a shareholder of Fine Rides, and was merely the owner of an unexercised
stock option.  Knowledge acquired by an
attorney during the existence of an attorney-client relationship, and while
acting in the scope of his or her authority, is imputed to the client.  See, e.g., Lehrer v. Zwernemann, 14 S.W.3d
775, 778 (Tex. App.CHouston [1st Dist.] 2000, pet. denied) (imputing knowledge that mediator had prior
dealings with opposing counsel); Allied Res. Corp. v. Mo‑Vac Serv. Co.,
871 S.W.2d 773, 778 (Tex.
App.CCorpus Christi 1994, writ denied) (imputing notice of hearing even though
attorney withdrew at beginning of hearing). 
Accordingly, McMahan had imputed knowledge of the Greenwood defendants=
position and was put on notice regarding the veracity of any alleged earlier
statements regarding his stock ownership in Fine Rides.  Therefore, as a matter of law, he cannot now
claim he relied on the alleged misrepresentations.  See Schindler, 768 S.W.2d
at 334 (upholding summary judgment based on insured plaintiff=s
deemed knowledge of contents of insurance contract); Coastal Corp. v. Atl.
Richfield Co., 852 S.W.2d 714, 721 (Tex. App.CCorpus Christi
1993, no writ) (stating that buyer could not continue to negotiate in reliance
on statements after learning of fraud); Camden Mach. & Tool, Inc. v.
Cascade Co., 870 S.W.2d 304, 311 (Tex. App.CFort Worth 1993, no
writ) (holding that when party=s investigation reveals falsity, party cannot, as a matter of
law, be said to have relied upon misrepresentations of another).

b.  The Accounting Reversals








McMahan also
argues that he was fraudulently induced to sign the settlement agreement
because of the defendants= failure to disclose the reversal of certain accounting
entries.  McMahan bases his arguments on
his affidavit and the deposition testimony of Cynthia Williamson, Fine Rides=
treasurer and bookkeeper.  Williamson
testified she made accounting entries demonstrating that McMahan contributed
certain assets toward fulfilling the requirements of his stock option.  She also testified she later reversed the
entries, and admitted that the assets then no longer appeared on the books as
contributions toward the stock option. 
McMahan contends the reversals transformed the contributions into
something more in the nature of loans from himself to the company rather than
an exercise of his stock option.  He
states in his affidavit that he learned for the first time at Williamson=s
deposition that the alleged contributions had been reversed, but at no point
does he state he was ever told about the original accounting entries.[4]  The accounting records themselves, which were
apparently used as exhibits in the deposition, do not appear in the appellate
record.

As discussed
above, we find that, prior to signing the settlement agreement, McMahan  had imputed knowledge of the Greenwood
defendants= position that he was not a shareholder, had never been a
shareholder, and was merely the owner of an unexercised option.  This imputed knowledge was sufficient to put
McMahan on notice at the time he signed the settlement agreement that his
contributions had not purchased 70% of Fine Rides as he claims to have been led
to believe.  The accounting reversals do
not change the fact that McMahan knew the Greenwood defendants=
position regarding his shareholder status in Fine Rides when he signed the
settlement agreement.  Furthermore, the
accounting reversals do not constitute a separate act of fraud, particularly
given that McMahan does not claim he was ever informed about the entries.  In sum, McMahan signed the settlement
agreement with, at a minimum, imputed knowledge that his contributions had not
entitled him to stock ownership. 
Accordingly, we find McMahan has failed to meet his burden of proof that
the release should be set aside based on fraudulent inducement.  See Sweeney, 824 S.W.2d
at 291; Deer Creek Ltd., 792 S.W.2d at 201.

2.  Duress








McMahan next
argues that the settlement agreement is void because it was the product of
duress.  Specifically, he contends the
Greenwood defendants forced him into signing the agreement by: (1) filing a
forcible entry and detainer action and obtaining a default judgment; (2) having
armed guards follow him while he was on the Fine Rides premises; (3) failing to
pay $20,000 that they owed him; and (4) telling him, falsely and groundlessly,
that criminal charges were being pursued against him.  McMahan claims these actions interfered with
his ability to transact business and placed him in a compromised financial
situation such that he had no other choice but to sign the settlement
agreement.

As a matter of
law, there can be no claim of duress unless the following elements are present:
(1) a threat or action was taken without legal justification; (2) the threat or
action was of such a character as to destroy the other party=s
free agency; (3) the threat or action overcame the opposing party=s
free will and caused it to do that which it would not otherwise have done and
was not legally bound to do; (4) the restraint was imminent; and (5) the
opposing party had no present means of protection.  Chapman Children=s
Trust v. Porter & Hedges, L.L.P.,
32 S.W.3d 429, 443 (Tex.
App.CHouston [14th Dist.] 2000, pet. denied).

McMahan first
contends the Greenwood defendants pursued a premature and wrongful forcible
entry and detainer action against him. 
However, the threat to institute a civil suit or even the actual
institution of a suit does not, as a matter of law, constitute duress.  Cont=l Cas. Co. v. Huizar,
740 S.W.2d 429, 430 (Tex. 1987); Executive Condos., Inc. v. State,
764 S.W.2d 899, 903 (Tex. App.CCorpus Christi
1989, writ. denied).  The rule remains in
force even if the person threatened does not have the financial wherewithal to
defend against the suit. Dannelley v. Bard, 62 S.W.2d 301, 308B309
(Tex. Civ. App.CBeaumont 1933, writ ref=d).  In the present case,
McMahan claims the Greenwood defendants acknowledged the wrongfulness of the
forcible entry and detainer action because 
the settlement agreement states the judgment in the action was Aentered
in error.@  Even assuming this
statement is an admission that the action itself was wrongful, it does not
convert the institution of the suit into the kind of imminent restraint
necessary to prove duress.  See Cont=l
Cas. Co., 740 S.W.2d
at 430.  McMahan was adequately protected
in the courts.  See Matthews v.
Matthews, 725 S.W.2d 275, 278 (Tex. App.CHouston [1st Dist.] 1986, writ ref=d
n.r.e.).  That he failed to protect
himself and a default judgment was entered against him likewise does not
convert the filing of the suit into evidence of duress.

 








McMahan next
argues that having armed guards trail him at the Fine Rides premises
constituted duress.  In support of this
argument, McMahan cites only to his own affidavit and to exhibits attached to
his motion for new trial.  The
attachments to the motion for new trial were not before the trial court when it
granted summary judgment and, hence, we will not consider them on appeal of
that judgment.  See Medlock v. Comm=n
for Lawyer Discipline, 24 S.W.3d
865, 871 (Tex. App.CTexarkana 2000, no pet.); Laurel v. Herschap, 5 S.W.3d
799, 802 (Tex. App.CSan Antonio 1999, no pet.). 
Regarding the armed guards, McMahan=s affidavit states A[a]t or about the time of the forcible entry and detainer suit,
I began to be followed at the Fine Rides, Inc. workplace by armed guards when I
was attempting to interact with employees and conduct business with customers
of Fine Rides, Inc.@  Contrary to the
suggestion in McMahan=s brief, this statement does not support the conclusion that he
was Aeffectively
precluded from being able to service customers and earn a living.@  The quoted language from the brief regarding
the ability to earn a living appears to be a mere summation of several pieces
of information that McMahan alleges caused him distress.  He does not contend that the presence of the
armed guards alone was sufficient to create actionable duress.  Indeed, in his affidavit  McMahan specifically states that Aa
restraining order [caused him] to be unable to work.@  In his deposition, McMahan explained that by Arestraining
order@
he meant the result of the detainer action. 
At most, the statement about armed guards creates no more than a mere
surmise or suspicion of duress and constitutes 
no evidence.  See Johnson v.
Brewer & Pritchard, P.C., 73 S.W.3d 193, 210 n.42 (Tex. 2002) (AWhen
the evidence offered to prove a vital fact is so weak as to do no more than
create a mere surmise or suspicion of its existence, the evidence is no more
than a scintilla and, in legal effect, is no evidence.@).








McMahan=s
contention that the Greenwood defendants owed him $20,000 and that Henderson,
on behalf of the Greenwood defendants, threatened to bring criminal charges
against him were not set forth in his responses to the motions for summary
judgment.  Consequently, we cannot
consider those claims in reviewing the validity of the summary judgment.  See Leinen v. Buffington=s
Bayou City Serv. Co., 824 S.W.2d
682, 685 (Tex. App.CHouston [14th Dist.] 1992, no writ) (holding that plaintiff could not raise fraud
issue on appeal when had not done so in pleadings or in response to motion for
summary judgment).  Additionally, the
only citations given by McMahan in support of these claims are to the proof attached
to his motion for new trial.  As stated
above, we do not consider such proof in reviewing a grant of summary
judgment.  See Medlock, 24 S.W.3d
at 871; Laurel, 5 S.W.3d at 802.  Accordingly, we
hold there is no evidence in the summary judgment record to raise a fact issue
concerning duress.

3.  Conditions Precedent

McMahan also
contends the settlement agreement is unenforceable because of the failure of
conditions precedent contained in the document. 
According to McMahan, the settlement agreement was conditioned on the
Greenwood defendants= release of all UCC encumbrances and liens within ten days from
the date of the agreement, the transfer of Fine Rides=
telephone number to McMahan upon the cessation of business, and the dismissal
of the detainer action.  McMahan argues
that none of these conditions precedent were fulfilled and, consequently, the
agreement (and particularly the release) never came into effect.

McMahan=s
arguments regarding conditions precedent are based on certain language in the
second paragraph of the agreement. 
Although McMahan relies only on the last sentence of the following
excerpt, the entire paragraph is included here for context:

The
intent of this Agreement is to resolve all matters between parties including
the division of assets, release of claims and/or liens against assets, the
resolution of ownership of shares of stock in Fine Rides, Inc. and the
resolution of any causes of action whether by tort, contract, statutory or
otherwise.  Upon the fulfillment of the
obligations and promises under this Agreement the parties [sic] intent is a
total separation of ways and no causes of action or claims to assets of the
other will exist.








Absent
ambiguity, a court must construe the meaning of a contract as a matter of
law.  Chapman v. Hootman, 999 S.W.2d
118, 122B23
(Tex. App.CHouston [14th Dist.] 1999, no pet.). 
Conditions precedent are acts or events that occur subsequent to the
formation of a contract and that must occur before there is a right to
immediate performance and before there can be a breach of contractual
duty.  Marsh v. Marsh, 949 S.W.2d
734, 743B44
(Tex. App.CHouston [14th Dist.] 1997, no pet.).  In
order to determine whether a condition precedent exists, the intention of the
parties must be ascertained, and that can be done only by looking at the entire
contract.  Criswell v. European
Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex.
1990).  Normally, in order to create a
condition precedent, an agreement must use a term such as  Aon condition that,@ Aif,@ Aprovided that,@ or some similar conditional phrase.  Id.; Cal-Tex Lumber Co. v. Owens
Handle Co., 989 S.W.2d 802, 809 (Tex. App.CTyler 1999, no
pet.).  Conditions precedent are not
favored in the law, and courts tend to construe contract provisions as
covenants rather than as conditions.  Criswell,
792 S.W.2d at 948; Marsh, 949 S.W.2d at 744.








In response to
McMahan=s
contention regarding conditions precedent, the Greenwood defendants argue the
language is merely a recital of the goal to be reached through entering into
the contract.  We agree.  A Arecital@ is A[t]he formal statement or setting forth of some matter of fact,
in any deed or writing, in order to explain the reasons upon which the
transaction is founded.@  Black=s Law Dictionary 1270 (6th ed. 1990); see
Universal Health Servs., Inc. v. Thompson, 63 S.W.3d
537, 543 (Tex. App.CAustin
2001, pet. granted) (AWe can look at recitals to ascertain the intent of the parties
in executing the contract, especially where the contract=s
operative terms are ambiguous.@); see also AFD Fund v. Midland Mgmt., No. Civ.A.3:
02CV0055-D, 2002 WL 731813, at *6B7 (N.D. Tex. Apr. 22, 2002) (holding that recital could not be
read as enlarging unambiguous terms of agreement).  The language cited by McMahan speaks to the
intent of the parties in executing the contract and in fulfilling the covenants
under the contract to effectuate a total business separation.  This language cannot convert covenants under
the contract into conditions precedent.

We further note
that the cited language does not contain any phrases expressly conditioning
performance of the agreement.  Instead,
the section states A[u]pon the fulfillment of the obligations and promises under
this agreement . . . .@  The reference to Aobligations
and promises@ is especially probative of an intent to create covenants
rather than conditions precedent because a condition precedent is something
that must exist before a duty of immediate performance of a promise
arises.  See, e.g., Ins. Corp. of Am.
v. Webster, 906 S.W.2d 77, 81 (Tex.
App.CHouston [1st Dist.] 1995, writ. denied). 
Failure to satisfy a condition precedent generally results in no
liability, but failure to perform a contractual obligation may create
liability.  See Centex Corp. v. Dalton,
840 S.W.2d 952, 956 (Tex. 1992). 
The use of the phrase Aobligations and promises,@ therefore, does not indicate the creation of conditions
precedent.

We find that
the language relied on by McMahan is a mere recital of the parties=
intentions in entering into the contract and that the alleged conditions
precedent are simply covenants under the contract.  Accordingly, the trial court did not err in
granting summary judgment against McMahan=s claims of conditions precedent.

B.  Breach of Contract








McMahan does
not argue that any of his claims would be spared from operation of the release
if the release were determined to be valid. 
However, his breach of contract claim was apparently for breach of the
settlement agreement itself; thus, the release could not preclude that
claim.  Even so, neither McMahan=s
response to the Greenwood defendants= motion for summary judgment nor his appellate brief do
anything more than mention the breach of contract claim.  Accordingly, by failing to present evidence
in the trial court, McMahan has waived his claim.  Moreover, by failing to present argument or
authority on appeal, he has waived his argument on appeal .  See Cuyler v. Minns, 60 S.W.3d
209, 216 (Tex. App.CHouston [14th Dist.] 2001, pet. denied) (plaintiff waived claims on appeal by
offering no argument or authority to avoid summary judgment); Dagley, 18
S.W.3d at 793 (no-evidence summary judgment is proper when there is complete
absence of proof of a vital fact).

C.  Conclusion

In conclusion,
we find the release contained in the settlement agreement signed by McMahan is
valid and effectively precludes McMahan=s underlying claims against the Greenwood defendants.  Consequently, we need not review his
additional arguments concerning alternative grounds for summary judgment, and
affirm the trial court=s summary judgment in favor of the Greenwood defendants.

IV.  Henderson=s
Summary Judgment Motion

McMahan
contends the trial court erred in granting Henderson=s
summary judgment motion.  In his motion,
Henderson alleged both traditional and no-evidence grounds.[5]  We address: (1) Henderson=s
claim that he was covered by the release; (2) Henderson=s
contention that all of McMahan=s causes of action are barred by the statute of limitations;
(3) Henderson=s various no-evidence grounds; and (4) his objections to
McMahan=s
affidavit.  Finding that some of McMahan=s
claims should have survived summary judgment, we affirm the judgment in part,
reverse in part, and remand for further proceedings.








A.  Waived and Abandoned Claims

In his reply
brief, McMahan states that his petition raised causes of action against Henderson
for fraud, fraudulent inducement, Anegligence/legal malpractice,@ breach of fiduciary duty, conversion, conspiracy, and concert
of action.  McMahan has failed to do more
than reference his conversion or concert of action claims, either in his
response to Henderson=s summary judgment motion or in his appellate brief.  Accordingly, we find these claims have been
waived by a failure to argue them in the trial court and on appeal.  See Cuyler, 60 S.W.3d at 216; Dagley,
18 S.W.3d at 793.[6]

B.  The Release

Henderson
argued in his motion for summary judgment that the release language in the
settlement agreement precludes any claims McMahan might have against him.  It is well settled in Texas that a release
covers only those people it names or otherwise specifically identifies.  McMillen v. Klingensmith, 467 S.W.2d
193, 196 (Tex. 1971).  To be effective,
the identification must be with such descriptive particularity that the person=s
identity or his connection with events is not in doubt.  Duncan v. Cessna Aircraft Co., 665
S.W.2d 414, 420 (Tex. 1984).  Under the
heading AMutual
Release,@
the settlement agreement between the parties provided as follows:








NOW,
THEREFORE, for and in consideration of the mutual promises and covenants above
and for other and good and valuable consideration each of the parties above
named for his predecessor, successor, assigns, heirs, executors, administrators
and legal representatives, release and forever discharge [sic] the other and
his predecessor, successors, assigns, executors, administrators and legal
representatives of and from any and all claims, demands, damages, actions,
causes of actions or suits in equity of whatsoever kind or nature whether
heretofore or hereafter accruing or whether now known or not known to the
parties for or because of any matter or thing done, omitted or suffered or to
be done by either of such parties prior to and including the date hereof and in
any way directly or indirectly arising out of the business relationship between
the parties.  (emphasis added)

 

McMahan
maintains the settlement agreement did not specifically identify Henderson as a
protected party.  Henderson argues he was
specifically identified by the term Alegal representatives.@ In his motion for rehearing, Henderson argues that the plain,
ordinary meaning of the term Alegal representatives@ includes an attorney at law. 
Indeed, he argues that it is a Asimple fact@ and there is Ano question@ the term Alegal representatives@ is synonymous with Aattorney.@  Thus, we must decide
whether the term Alegal representatives@ as used by the parties in the settlement agreement included
Henderson.

We begin our
analysis by noting that a release is a contract.  Williams v. Glash, 789 S.W.2d 261, 264
(Tex. 1990).  In construing a written
contract, the primary concern of the court is to ascertain the true intentions
of the parties as expressed in the instrument. 
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  If a written instrument is so worded that it
can be given a certain or definite legal meaning or interpretation, then it is
not ambiguous and the court will construe the contract as a matter of law.  Century Bass Club v. Millender, 949 S.W.2d
841, 844 (Tex. App.CWaco 1997, pet. denied). 
Language should be given its plain grammatical meaning unless it
definitely appears that the intention of the parties would be thereby
defeated.  Id. at 844B45.

1.  The Meaning of ALegal
Representatives@








The
interpretation of the term Alegal representatives@ is a familiar task to appellate courts.  Caudle v. Eckles, 138 S.W.2d 468, 469
(Ky. 1940).  In the past, Texas courts
have grappled with the meaning of the term, although we find no Texas case in
which the issue at hand was squarely decided. 
See Allen v. Stovall, 63 S.W. 863, 865 (Tex. 1901) (construing
the statutory term Alegal representatives@ to include heirs at law); Commercial Standard Ins. Co. v.
Herrin, 515 S.W.2d 163, 166 (Tex. Civ. App.CEastland 1974, no writ) (finding that the surviving widow of the named
insured is a Alegal representative@ under insurance policy); Knoff v. United States Fid. &
Guar. Co., 447 S.W.2d 497, 501 (Tex. Civ. App.CHouston
[1st Dist.] 1969, no writ) (finding the term >legal representatives= in a fire insurance policy was not used in a Atechnical
sense@
and thus included Asuccessors in interest in the real property insured@).  

Thus, we are
called upon to interpret the meaning of the phrase Alegal
representatives@ as used by the parties in the release.  At common law, when there is nothing in the
context to control its meaning, its primary and ordinary meaning is Aexecutors
and administrators.@  See Briggs v. Walker,
171 U.S. 466, 471 (1898); see also Averbuck v. Stoller, 344 N.E.2d 198,
199 (Mass. App. Ct. 1976) (AThe words >legal representative= naturally connote [one=s] executors.@).  Though Henderson
neither cites to nor relies upon cases to this effect, there is ample jurisprudence
for the common law definition of the term.[7]  








More generally,
Black=s
Law Dictionary defines the term as Aone who stands in place of, and represents the interests, of
another@
and provides as examples the executor of an estate and the court appointed
guardian of a minor.  Black=s Law Dictionary 896 (6th ed. 1990).[8]  Black=s also explains that the term is generally considered
synonymous with Apersonal representative.@  Id.; see also Unsatisfied Claim &
Judgment Fund v. Hamilton, 259 A.2d 303, 306 (Md. 1969) (noting the term
legal representative is Aalmost always held to be synonymous@
with the term personal representative); Missouri ex rel. Emmons v.
Hollenbeck, 394 S.W.2d 82, 86 (Mo. Ct. App. 1965) (noting the statutory
term Apersonal
representative@ was synonymous with Alegal representative which is a generic term denoting an
administrator or executor of a deceased person@).

 








Although the
term has Ano fixed and unyielding meaning in law,@
it reaches Aonly those individuals who are in a position tantamount to that
of party or whose legal rights were otherwise so intimately bound up with
parties that their rights were directly affected by final judgment.@
 In re El Paso Refinery, LP, 37
F.3d 230, 234 (5th Cir. 1994) (quoting Kem Mfg. Corp. v. Wilder, 817
F.2d 1517, 1520 (11th Cir. 1987)).  Texas
case law suggests a Alegal representative@ is one who is a party substitute or one who can sue on another=s
behalf.  See Clark v. Turner, 505
S.W.2d 941, 948 (Tex. Civ. App.CAmarillo 1974, no writ) (noting that upon death of a party, the
legal representative is substituted as party plaintiff or defendant); see
also Estate of Pollack v. McMurrey, 858 S.W.2d 388, 390 n.2 (Tex. 1993)
(noting Athe
decedent=s
answer in an original action inures to the benefit of his legal representative@
(the personal representatives of the estate) and prevents rendition of a valid
default judgment for failure to file an answer); Pack v. Crossroads, Inc.,
53 S.W.3d 492, 515B16 (Tex. App.CFort Worth 2001, pet. denied) (discussing the ability of legal
representatives to sue or be sued under Survival Statute, Tex. Civ. Prac. & Rem. Code Ann. '
71.021); Phifer v. Nacogdoches County Cent. Appraisal Dist., 45 S.W.3d
159, 172 (Tex. App.CTyler 2000, pet. denied) (discussing the defense of a suit by a
legal representative under Tex. R. Civ.
P. 152 after the death of the defendant).  Plainly, the preceding authority suggests the
term Alegal
representative@ refers to one who succeeds to a party=s
legal rights, by reason of death, or the operation of law.  

2.  Recent Authority








Nevertheless,
Henderson insists that to adopt an interpretation contrary to his would be to
ignore Athe
irrefutable fact that attorneys and courts throughout this country . . .
consistently and without hesitation, use the term >legal
representative= to refer to the party=s attorney.@  In support of his
argument, Henderson directs our attention to two related cases from our
court.  In Cramer v. Piro, the
wife in a divorce action sued her husband=s attorney.  No. 14‑95‑00572‑CV,
1995 WL 688869, at *1 (Tex. App.CHouston [14th Dist.] Nov. 22, 1995, writ denied) (not
designated for publication).  Both
parties to the divorce action signed a mutual release in which they released
one another and their predecessors, successors, assigns, heirs, executors, and
administrators, as well as their legal representatives.  Id. at *1 n.1.  The wife had sought to avoid application of
the release by establishing it was unenforceable due to fraud, duress, mistake,
and lack of consideration.  Id. at
*1.  The attorney filed a motion for
summary judgment, which the trial court granted without specifying its
grounds.  Id. at *1.  We affirmed the grant of summary judgment and
found that the wife did not raise a fact issue concerning the enforceability of
the release.  Id.  However, nowhere in Cramer did we
specifically hold that the term Alegal representatives@ necessarily and in every case includes attorneys at law.  In affirming the summary judgment on the
grounds that the release was enforceable, we did not analyze its specific usage
in conjunction with other provisions of the release or the traditional common
law definition.  Thus, we could only
speculate what language, terms, or omissions of terms in the release prompted
the Cramer court to affirm the summary judgment of the trial court on
the grounds that the attorney was released from claims asserted by the
wife.  Here, McMahan does not argue the
release is unenforceable as to Henderson, but that he is not covered by
it.  Thus, McMahan places the scope of
the term Alegal representatives@ directly at issue, and we are called upon to discern the
intent of the parties in the instant transaction..








Henderson also
cites the related case of Beach v. Beach, in which this court dealt with
a declaratory judgment premised upon both an action by the Cramer attorney
and a motion and action by his client, the husband.  912 S.W.2d 345, 346 (Tex. App.CHouston
[14th Dist.] 1995, no writ).  The
attorney sought a declaration that the wife had no cause of action against him
and that the divorce decree terminated any causes of action she might have had,
while the husband filed a motion to enforce the divorce decree and a request
for a declaratory judgment that the wife had no causes of action against either
the attorney or the husband.  Id.
at 347.  The scope and definition of the
term were not directly at issue on appeal. 
Before finding that the trial court=s declaratory judgment was a nullity, this court suggested in
dicta that although the attorney was not a party to the release in question and
was not referred to by name in the release he was nevertheless referred to by
the term Alegal representatives.@  Id. at 346
n.1.  Beach stands for the
proposition that the trial court was deprived of the power to enter the
declaratory judgment because the attorney=s intervention was untimely and the husband=s
motion and action for declaratory judgment petitioned the trial court to stray
beyond its power to enforce the division of property after the rendition of the
divorce decree.  Id. at 348.  Thus, we cannot say that the dicta in Beach
is dispositive of our inquiry when that case did not directly confront the
issue at hand.

Henderson also
cites a series of state and federal cases in support of his proposition that an
attorney is necessarily a Alegal representative.@  However, we note that
in some of those cases, the term is used merely in dicta or in a recitation of
factual or procedural background.[9]  In none of the cases was the court confronted
with the task of interpreting the term Alegal representatives.@

3.  Are Attorneys Necessarily Legal
Representatives?








Our research
reveals that a majority of courts, when confronted with the issue of whether an
attorney falls within the definition of the term Alegal representatives,@ have rejected the argument advanced by Henderson.  Federal courts have refused to interpret the
term, as used in Federal Rule of Civil Procedure 60 governing relief from final
judgments, to include attorneys.  See
Western Steel Erection Co. v. United States, 424 F.2d 737, 739 (10th
Cir. 1970) (AWe therefore hold that an attorney does not have standing to
move under [Federal Rule of Civil Procedure] 60(b) as a >legal
representative.=@);
Mobay Chem. Co. v. Hudson Foam Plastics Corp., 277 F. Supp. 413, 416B18
(S.D.N.Y. 1967) (finding the phrase Alegal representative@ as used in Federal Rule of Civil Procedure 60(b) does not
include legal counsel within the context of the attorney‑client relationship);
see also Rende v. Kay, 415 F.2d 983, 985 (D.C. Cir. 1969) (AAlthough
the attorney for the defendant was retained to >represent= the deceased as his counsel, he is not a person who could be
made a party, and is not a >representative of the deceased party=
in the sense contemplated by [Federal Rule of Civil Procedure] 25(a)(1).@)  So too have state courts concluded that an
attorney is not a Alegal representative.@  Peterson v. Ballard,
679 A.2d 657, 661B62 (N.J. Super. Ct. App. 1996) (declining to hold that the
statutory term Alegal representative@ is synonymous with Aattorney@); Etterle v. Excelsior Ins. Co. of New York, 428
N.Y.S.2d 95, 98(N.Y. App. Div. 1980) (noting that A[t]here
is nothing here which suggests that, in the context of the power of attorney,
the attorney in fact becomes a >legal representative=@);
but see Regents of Univ. of New Mexico v. Lacey, 764 P.2d 873, 875 (N.M.
1988) (finding the statutory interpretation that an attorney is a legal
representative Anot unreasonable@ as attorneys are agents or those Aappointed
and authorized to act in the place or stead of another@).








This primary
meaning of the term Alegal representatives@ would, of course, yield to a context which clearly showed a
different meaning was intended.  See
Woolsey v. Nationwide Ins. Co., 884 F.2d 381, 384 (8th Cir. 1989) (noting
the term Alegal representatives@ may also have a Awider meaning depending on the intentions of the parties as
manifested by the context of the policy or the surrounding circumstances.@);
Milner v. Dudrey, 362 P.2d 439, 442B43 (Nev. 1961) (noting that the words >legal
representative= Ashould be interpreted in each case in accord with the
surrounding facts and circumstances.@); Larkins v. Routson, 155 N.E. 227, 230 (Ohio 1927)
(noting that the phrase Ais to be construed in the light of the context, the subject‑matter,
and the circumstances under which it is used.@)  Here, nothing in the
language of the settlement agreement indicates that the parties=
intended the term Alegal representatives@ was to be used other than in its ordinary sense.  The classes of persons identified in the
agreement, i.e., Apredecessor, successor, assigns, heirs, executors,
administrators, and legal representatives,@ refer to people or entities that could stand in the place of
or assert the same rights as a party to a lawsuit.  See
Black=s Law Dictionary 46, 118, 570, 724, 896, 1177, 1431.  The listing of such persons in the release
does not include attorneys or other mere agents of the parties.

4.  Internal Consistency

Furthermore, in
construing a written contract, courts should examine and consider the entire
writing in an effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless.  Coker, 650 S.W.2d at 393.  No single provision taken alone will be given
controlling effect; rather, all the provisions must be considered with
reference to the whole instrument.  Id.  Here, the term Alegal representatives@ occurs in a phrase which includes various entities which
contemplate prospective parties or holders of an interest in an action C
Apredecessor,
successor, assigns, heirs, executors, administrators, and legal representatives@
C
rather than agents or those engaged in the practice of law.  In that context, it seems more likely the
release was referring to some sort of legal party substitute rather than
outside counsel when it recited those who would be affected by the release.  This is also evidenced by the fact that
elsewhere in the settlement agreement Henderson is specifically referred to by
the phrase A[the parties=] respective attorneys,@ rather than the term Alegal representatives.@

 








The settlement
agreement repeatedly distinguishes between an Aattorney@ and a Alegal representative@ and does not treat these terms as synonymous.  The phrase Alegal representatives@ in the settlement agreement did not specifically identify
Henderson as a released party.  Cf.
Ill. Nat=l Ins. Co. v. Perez,
794 S.W.2d 373, 376 (Tex. App.CCorpus Christi 1990, writ denied) (holding that term Ainsurers@
in settlement agreement release did not bar claim against workers=
compensation carrier).  Had the intention
of the parties been to extend the scope of the document to release the parties=
attorneys, they could easily have referred to Henderson as a Alegal
representative@ rather than an Aattorney@ or included a definitional section which clarified the usage
of the term.  The omission of the word Aattorney@
from the list of those parties released, notwithstanding the repeated use of
that word in the provisions of the release, must be deemed to indicate that the
term Alegal
representative@ was not meant to include a party=s attorney.

5.  Conclusion

In accordance
with all the foregoing authority, we will perform our duty to select and apply
a meaning of Alegal representatives@ which would be fair and reasonable, consistent with the entire
context of the language in which the words are employed, and would effectuate
the purpose of the release rather than defeat it.  Henderson does not allege he acted in a
capacity other than as the attorney for the Greenwood defendants.  Nor does he represent that his interest in the
claim is such that he should be made a party on behalf of his client.  Henderson, as an attorney, is not one whose
rights are bound up with those of the parties to the suit, nor is an attorney
contemplated to become a party to the suit by virtue of his status as legal
counsel.  We find the term Alegal
representatives@ as used in the settlement agreement is not synonymous with Aattorney@
and was not intended to include the attorneys to the transaction.  Accordingly, we find that in signing the
release, McMahan did not relinquish his claims against Henderson.

 








C.  Statute of Limitations

Henderson next
argues that all of McMahan=s causes of action are barred under the statutes of
limitations.  Specifically he contends
that, because McMahan=s alleged damages all accrued, at the latest, at the time he
signed the settlement agreement, all of his claims are barred under the
two-year statute of limitations.[10]  The settlement agreement was signed on March
30, 1994, and McMahan filed suit on March 27, 1998.

McMahan pleaded
four means for avoiding application of the statute of limitations: (1) the
discovery rule; (2) fraudulent concealment; (3) the doctrine of unclean hands;
and (4) absence from state.

                                                 1.  Discovery Rule








When
application of the discovery rule is raised by the non-movant, a party moving
for summary judgment on the affirmative defense of limitations must prove as a
matter of law that there is no genuine issue of material fact as to when the
non-movant=s causes of action accrued and when the movant  discovered, or in the exercise of reasonable
diligence should have discovered, the nature of his or her injury.  KPMG Peat Marwick v. Harrison County Hous.
Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  In attempting to meet this burden for  negating the discovery rule, Henderson relied
on a letter exhibit in McMahan=s response opposing summary judgment.  The letter, dated April 3, 1989 and written
by Howard Greenwood, states that Fine Rides was owned 100% by Howard Greenwood
Investments, Inc.  Henderson argues the
letter proves that McMahan knew or should have known the nature of his injury
in 1989.

Henderson=s
proof fails to establish his limitations defense, as the letter does nothing
more than prove what McMahan knew as of the time he filed his response to the
motion for summary judgment, falling far short of conclusively proving that
McMahan knew or should have known of its content prior to that time.  Furthermore, the letter does not necessarily
put McMahan on notice as a matter of law of any alleged fraud in the division
of stock ownership rights.  McMahan
states the business was started in April of 1989 and that he was to receive his
stock only after contributing assets to the company.  In absence of proof by Henderson that the
assets had in fact been contributed and McMahan=s stock ownership rights accrued by April 3, 1989, the letter=s
statement regarding ownership of the stock as of that date was not necessarily
incorrect.  Thus, the letter would not
have necessarily put McMahan on notice of any alleged fraudulent conduct at
that time.  Accordingly, we find
Henderson failed to conclusively negate application of the discovery rule.

                                          2.  Fraudulent Concealment

To prove
fraudulent concealment, a plaintiff must demonstrate the defendant had actual
knowledge that a wrong occurred, a duty to disclose the wrong, and a fixed
purpose to conceal the wrong.  Mellon
Serv. Co. v. Touche Ross & Co., 17 S.W.3d 432, 436 (Tex. App.CHouston
[1st Dist.] 2000, no pet.); Li v. Univ. of Tex.  Health Science Ctr., 984 S.W.2d 647, 653
(Tex. App.CHouston [14th Dist.] 1998, pet denied).  Thus, to raise fraudulent concealment as a
means of tolling limitations, McMahan must have first offered  proof that Henderson had actual knowledge
that a wrong occurred.








McMahan=s
core complaints against Henderson are that (1) Henderson verbally told him he
had obtained stock ownership in Fine Rides by contributing assets to the
company and did not need to actually receive stock certificates; (2) he
contributed additional assets believing he was a shareholder; (3) he signed the
settlement agreement after being led to believe he owned stock in a failed
business; and (4) he subsequently received a letter from Henderson dated
September 19, 1996 telling him he could not receive tax credits for the losses
because he had never been a shareholder and had never received stock
certificates.  These allegations are
supported in the record by McMahan=s affidavit and the letter from Henderson, and provide at least
some evidence that Henderson had actual knowledge of the alleged wrongful acts.
Taking as true McMahan=s allegation that Henderson told him he was a shareholder, we
find Henderson=s statement in the 1996 letter that McMahan never was a
shareholder raises a reasonable inference that Henderson knew the verbal
statements were false when made.








It is the
second element C duty to disclose C that Henderson vigorously disputes.  Henderson contends the doctrine of fraudulent
concealment is inapplicable as he had no duty to disclose anything  to McMahan in the absence of an attorney-client
relationship between them.  However, as
stated later in our discussion of McMahan=s claims of legal malpractice, we find McMahan presented more
than a scintilla of evidence regarding the existence of an attorney-client
relationship as of the time the alleged misrepresentations occurred.[11]  Regardless, McMahan stated in his affidavit
that Henderson represented to him that he, McMahan, was an owner of Fine Rides
and that receiving actual stock certificates was a mere formality.  Even if Henderson had only been representing the
Greenwood defendants when he allegedly made those statements, or later when he
allegedly failed to disclose the falsity of the statements during negotiations,
he was still under a duty to disclose the entire truth and to correct any
misimpressions caused by his earlier statements.  See Anderson, Greenwood & Co.
v. Martin, 44 S.W.3d 200, 212B13 (Tex. App.CHouston [14th Dist.] 2001, pet. 
denied).  Consequently, there is
at least some evidence to show he had a duty to disclose.

McMahan=s
proof is also sufficient to raise a fact issue on the third element of
fraudulent concealment, as there is at least some evidence that when Henderson
allegedly told McMahan he was a shareholder in Fine Rides, Henderson would have
known this was not true, yet he continued to conceal the fact that McMahan was
not a shareholder.  In short, we find
McMahan presented sufficient proof to raise a fact issue as to each element of
his fraudulent concealment defense to the statute of limitations.

3.  Unclean Hands

McMahan further
asserted that Henderson could not utilize a limitations defense because
Henderson violated the doctrine of clean hands. 
The doctrine can be raised by a plaintiff, but only to attack an
equitable defense alleged by a defendant. 
See generally Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.,
817 S.W.2d 160, 165B66 (Tex. App.CHouston [14th Dist.] 1991, no writ); Hughes v. Aycock,
598 S.W.2d 370, 375 (Tex. App.CHouston [14th Dist.] 1980, writ ref=d
n.r.e.).  As limitations is a statutory
defense  not grounded in equity, see 30A
C.J.S. Equity ' 154 (comparing statute of limitations defense with equitable
defense of laches), we find that as a matter of law, McMahan=s
unclean hands argument fails.

4.  Absence from State








McMahan also
argued that Henderson=s absence from the state tolled the statute of
limitations.  However, he failed to
address this issue in his response to Henderson=s summary judgment motion, and on appeal, acknowledges that
Henderson=s absence was probably not sufficient to toll limitations for a
legally significant period of time. 
Accordingly, this argument was not preserved in the trial court and has
been abandoned on appeal.  See Cuyler,
60 S.W.3d at 216.

We find
Henderson failed to conclusively negate the discovery rule and McMahan
presented sufficient proof to raise a fact issue as to each element of
fraudulent concealment.  Accordingly,
the trial court=s summary judgment is not supported by Henderson=s  limitations defense.

D.  No-Evidence Grounds

1.  Fraud/Fraudulent Inducement

 

McMahan
contends Henderson falsely told him he was a shareholder of Fine Rides to
induce him into contributing assets to the company, and then failed to correct
the misrepresentation prior to the execution of the settlement agreement.   Henderson=s summary judgment motion raised no-evidence grounds against
these claims, and alleged that: (1) any misrepresentations as to stock  ownership were not material because McMahan
released any claim to stock ownership in the settlement agreement; (2) any failure
to disclose was not fraudulent because there was no duty to disclose; and (3)
any misrepresentation or failure to disclose was not actionable because it
occurred in an adversarial context.

Henderson=s
first argument ignores the very point of McMahan=s fraudulent inducement claim: that he would not have signed
the settlement agreement had he known Henderson=s representations were false. 
Accordingly, we find as a matter of law that  the release language does not defeat McMahan=s
fraudulent inducement claims against Henderson, and that McMahan presented at
least some evidence that Henderson made material misrepresentations.








Henderson=s
second argument also fails, as we have already found McMahan presented more
than a scintilla of evidence to demonstrate that under the facts of this case,
Henderson had a duty to disclose McMahan=s lack of stock ownership.

Henderson=s
third argument appears to challenge the reasonableness or justification of
McMahan=s
reliance on his statements.  Henderson
couches his arguments in terms of the tort of negligent misrepresentation.  McMahan pleaded this cause of action and we
discuss it in detail below.  We find
McMahan presented more than a scintilla of evidence that he justifiably relied
on Henderson=s statements. 
Accordingly, we find Henderson=s no-evidence grounds against McMahan=s
fraud and fraudulent inducement causes of action without merit.

                                                       2.  Duress

Henderson next
raised no-evidence arguments against McMahan=s claim that he signed the settlement agreement under
duress.  As McMahan=s
claims of  duress against Henderson
parallel those raised against the Greenwood defendants, we reach the same
conclusion as with the Greenwood defendants, and find no evidence of duress .  Accordingly, the trial court did not err in
granting summary judgment against McMahan on his claim that he signed the
release under duress. 

                             3.  Malpractice and Breach of Fiduciary Duty








Henderson
alleged traditional and no-evidence summary judgment grounds against McMahan=s
claims of legal malpractice and breach of fiduciary duty.  In a legal malpractice claim, a plaintiff
must prove the attorney owed the plaintiff a duty,  that duty was breached, the breach
proximately caused the plaintiff=s injuries, and damages occurred.  Peeler v. Hughes & Luce, 909 S.W.2d
494, 496 (Tex. 1995).  Attorneys may be
liable for a breach of fiduciary duty, but such a claim requires allegations of
self-dealing, deception, or misrepresentations that go beyond the mere
negligence allegations in a malpractice action. See Goffney v. Rabson,
56 S.W.3d 186, 193B94 (Tex. App.CHouston [14th Dist.] 2001, pet. denied).  If the gist of a client=s
complaint is that the attorney did not exercise that degree of care, skill, or
diligence as attorneys of ordinary skill and knowledge commonly possess, then
that complaint should be pursued as a negligence claim, rather than some other
claim.  Deutsch, 97 S.W.3d at
189.  If, however, the client=s
complaint is more appropriately classified as a fraud, DTPA, breach of
fiduciary duty, or breach of contract complaint, then the client can assert a
claim other than negligence.  See id.  As Henderson made the same argument for both
of these propositions, we address them together.

McMahan alleged
that because Henderson gave him false information and advice regarding his
stock ownership in Fine Rides, he continued to transfer assets to Fine Rides
and later signed the settlement agreement, rather than attempting to recover
the full value of the assets he contributed. 
Henderson=s sole argument in his motion is that there is no evidence of
an attorney-client relationship between himself and McMahan at the time of the
negotiation, preparation, and execution of the settlement agreement.  Henderson=s argument, however, misinterprets McMahan=s
allegations.








McMahan
contends Henderson was his attorney at the time Henderson made the statements
to him regarding his stock ownership in Fine Rides, not at the time of the
settlement negotiations.  McMahan=s
affidavit states he and Howard Greenwood went to Henderson to obtain advice on
structuring the business and to have him draft the necessary documents for
incorporating Fine Rides.  According to
McMahan, Henderson prepared all of the documents and later provided advice
specifically to him on other matters regarding Fine Rides.  McMahan expressly stated he understood
Henderson to be acting as his attorney. 
Henderson=s motion and attached affidavit do not refute the existence of
an attorney-client relationship during that earlier period, nor does evidence that Henderson was Greenwood=s attorney at the formation of Fine
Rides conclusively prove he was not also acting as McMahan=s attorney at the time.  See Yaklin v. Glusing, Sharpe &
Krueger, 875 S.W.2d 380, 384 (Tex. App.CCorpus Christi 1994, no writ)
(holding that evidence attorney represented one party to transaction did not
conclusively prove he did not also represent other party).  Henderson cites no
authority for the proposition that once an attorney-client or other fiduciary
relationship terminates, the burden rests on the client or beneficiary to
determine the veracity of statements made by the attorney or fiduciary during
the course of the relationship.  Indeed,
Texas law holds to the contrary:  if an
attorney or fiduciary has made misstatements, it is incumbent upon him or her
to make a full disclosure of the truth.  See
generally Willis v. Maverick,  760
S.W.2d 642, 645 (Tex. 1988); Anderson, Greenwood & Co., 44 S.W.3d at
212B13.  Accordingly, we find McMahan=s
malpractice and breach of fiduciary duty claims survive Henderson=s
no-evidence grounds for summary judgment.

                                        4.  Negligent Misrepresentation

Henderson next
presented a no-evidence ground challenging McMahan=s
claim for negligent misrepresentation. 
Under section 552 of the Restatement of Torts:

One who, in the course of
his . . . profession . . . supplies false information for the guidance of
others in their business transactions, is subject to liability for pecuniary
loss caused to them by their justifiable reliance upon the information, if he fails
to exercise reasonable care or competence in obtaining or communicating the
information.

 

Restatement
(Second) of Torts '
552(1) (1977).  The Texas Supreme Court
recognizes that although this provision imposes a duty on attorneys to avoid
misrepresentation irrespective of privity, liability is limited under section
552(2)(a) to situations in which the attorney providing the information is
aware of the non-client and intends that the non-client rely on the
information.  McCamish, Martin, Brown
& Loeffler v. F.E. Appling Interests, 991 S.W.2d 787, 794 (Tex. 1999).








McMahan argues
that if Henderson represented only the Greenwood defendants at the time he
allegedly made the statements regarding stock ownership, then Henderson made
false statements without exercising reasonable care or competence in obtaining
or communicating the information and with the intent that McMahan rely on the
misrepresentations.  Henderson counters,
however, that there is no evidence of any alleged material misrepresentation
and that the evidence conclusively demonstrates that  he and McMahan were in adversarial positions
during the negotiation, drafting, and execution of the settlement agreement,
such that McMahan could not have justifiably relied on Henderson=s
statements regarding stock ownership. Henderson=s arguments are identical to those he asserted against McMahan=s
fraud and fraudulent inducement causes of action.  For the reasons we rejected them there, we
reject them here.

In determining
whether a plaintiff has met the requirement of justifiable reliance under
section 552, we must consider the nature of the relationship between the
attorney, the client, and the nonclient.  Id.  Generally
speaking, a third party is not justified in relying on an attorney=s
representation when made in an adversarial context.  Id. 
However, not every situation outside of litigation is clearly defined as
adversarial or nonadversarial, and consequently, we examine the extent to which
the interests of the client and the third party are consistent with one
another.  Id.

Here, while
statements made during settlement negotiations were likely made in an
adversarial context, statements made during the formation and operation of Fine
Rides most likely were not.  Absent
fraud, the Greenwood defendants and McMahan were ostensibly working toward the
same goal of a successful business venture, and Henderson=s
alleged initial statements regarding stock ownership would have acted to ensure
that McMahan continued to work for Fine Rides and contributed assets to the
company.








Henderson cites
no authority, and we have found none, suggesting that simply because parties
become adversarial after statements are made, the non-client cannot continue to
justifiably rely on the uncorrected earlier statements.  The extent, if any, to which the change in
the nature of the relationship to an adversarial one may have affected the
justification of McMahan=s reliance is a question of fact, and the trial court erred in
granting summary judgment against McMahan=s negligent misrepresentation claims. 

5.  Conspiracy

Last, Henderson
lodged no-evidence grounds against McMahan=s conspiracy claims. To prove a conspiracy, McMahan must show a
combination of two or more persons, an object to be accomplished, i.e.,
an unlawful purpose or a lawful purpose by unlawful means, a meeting of minds
on the object or course of action, one or more unlawful, overt acts, and  damages as the proximate result.  See Ins. Co. of N. Am. v. Morris, 981
S.W.2d 667, 675 (Tex. 1998).

Henderson
argues only that there is no evidence he committed any unlawful overt act.  Because we have found McMahan=s
fraud, fraudulent inducement, legal malpractice, and negligent
misrepresentation claims survive Henderson=s no-evidence challenges, we also conclude there is at least
some evidence that Henderson committed an unlawful overt act against McMahan,
and find the trial court erred in granting summary judgment against McMahan=s
conspiracy claims.

In sum, we find
the trial court erred in granting Henderson=s summary judgment motion on McMahan=s
fraud, fraudulent inducement, legal malpractice, breach of fiduciary duty,
negligent misrepresentation, and conspiracy claims.

E.  Objections to McMahan=s
Affidavits








McMahan
attached lengthy affidavits to his response to the motions for summary
judgment.  Although appellees raised
numerous objections to these affidavits at trial, they failed to obtain written
rulings on the objections.  Consequently,
any objections as to form (such as hearsay, speculation, competence) are
waived.  See Hou-Tex v. Landmark
Graphics, 26 S.W.3d 103, 112 (Tex. App.CHouston [14th Dist.] 2000, no pet.).  However, any objections relating to
substantive defects (such as lack of relevancy, conclusory) can be raised for
the first time on appeal and are not waived by the failure to obtain a ruling
from the trial court.  See id.  We find it unnecessary to determine whether
each statement in McMahan=s affidavits would be admissible evidence.  See Tex.
R. Civ. P. 166a(f) (stating that affidavits in support of summary
judgment must set forth facts as would be admissible).  Instead, in our analysis, we have considered
only statements that we deem to be admissible in light of the failure to obtain
written rulings at trial.

                                                     V.  Motion for Continuance








In his third
issue, McMahan contends the trial court erred in denying his motion for
continuance filed prior to the hearing on Henderson=s
no-evidence motion for summary judgment. 
The decision to grant or deny a motion for continuance is within the
trial court=s discretion, and such determination will be reversed only upon
showing of a clear abuse of discretion. Clemons v. State Farm Fire &
Cas. Co., 879 S.W.2d 385, 393 (Tex. App.CHouston [14th Dist.]
1994, no writ).  A trial court abuses its
discretion when it acts without reference to any guiding rules or principles.  Downer v. Aquamarine Operators, Inc., 701
S.W.2d 238, 241B42 (Tex. 1985).  A party
may move for a no-evidence summary judgment after adequate time for discovery
has passed.  Tex. R. Civ. P. 166a(I); Specialty Retailers, Inc. v.
Fuqua, 29 S.W.3d 140, 145 (Tex. App.CHouston [14th Dist.]
2000, pet. denied).  AAdequate
time@
is determined by the nature of the cause of action, the evidence necessary to
controvert the no‑evidence motion, and the length of time the case had
been active.  Id.  A court may also look to factors such as the
amount of time the no‑evidence motion has been on file, whether the
movant has requested stricter time deadlines for discovery, the amount of
discovery that has already taken place, and whether the discovery deadlines
that are in place are specific or vague. 
Id.

McMahan filed
the present lawsuit on March 27, 1998. 
The order granting summary judgment was signed on July 24, 2000.  Consequently, a total of almost twenty-eight
months lapsed between the time the lawsuit was filed and the grant of summary
judgment.  Factoring in a sixteen-month
bankruptcy stay, there remained a full year for discovery.  Furthermore, the stay did not prevent McMahan
from continuing to develop his case from those documents already in his possession.

McMahan=s
motion for continuance alleged Henderson=s counsel engaged in dilatory tactics regarding responses to
written discovery, which led to an earlier continuance being granted.  The record does not contain any prior motion
for a continuance nor does McMahan contend, in his motion or in his appellate briefs,
that the alleged dilatory tactics on written discovery continued beyond the
grant of the initial continuance. 
Standing alone, these allegations of past tactics do not support the
conclusion that the trial court erred in refusing a second continuance,
particularly in light of the granting of the first continuance.  Cf. Lattrell v. Chrysler Corp., 79 S.W.3d
141, 147 (Tex. App.CTexarkana 2002, pet. denied) (considering grant of prior continuance as
militating against finding error in denial of subsequent motion).








McMahan=s
motion further alleges Henderson=s counsel delayed discovery by seeking to quash a scheduled
deposition.  On appeal, McMahan claims
the motion to quash pertained to Henderson=s deposition.  However,
Henderson stated to the trial court, and argues on appeal, that the motion to
quash was of McMahan=s deposition.
The motion itself does not appear in the record, and we assume that missing
portions of the record support the correctness of the trial court=s
judgment.  McFarland v. Szakalun,
809 S.W.2d 760, 764 (Tex.
App.CHouston [14th Dist.] 1991, writ denied).  In
either event, assuming the quashed deposition was McMahan=s,
he cannot contend it hampered his preparation of a response to the motion for
summary judgment, as anything he would have said in the deposition, he could
have said in his affidavit.  And assuming
the quashed deposition was of Henderson, this fact, without information as to
the timing of the motion to quash and the diligence of McMahan=s
attempts to set the deposition, would not support a finding of abuse of
discretion.  Cf. Laughlin v. Bergman,
962 S.W.2d 64, 66 (Tex.
App.CHouston [1st Dist.] 1997, no pet.) (finding error in denial of motion where movant
had been thwarted in numerous attempts to schedule opposing party=s
deposition and had agreed to date two months after party=s
motion for summary judgment was filed).

McMahan makes
no argument and cites to no references in the record that would allow us to
determine the extent of discovery undertaken prior to the filing of the motion,
the nature of any discovery deadlines imposed by the court, or the length of
time between the filing of Henderson=s no evidence points and the hearing on the motion.  Consequently, these factors cannot be said to
weigh in McMahan=s favor. We do not find the trial court abused its discretion
in denying the motion for  continuance,
and overrule McMahan=s third issue.

                                           VI.  Motion for New Trial








In his fourth
issue, McMahan contends the trial court erred in denying his motion for new
trial because the evidence attached to his motion, which had not been attached
to his responses to Henderson=s and the Greenwood defendants= motions for summary judgment, defeats those motions.  McMahan fails, however, to offer a cogent
basis on which we may consider the additional evidence.  In his brief, McMahan only argues that the
new evidence defeats the motions for summary judgment.  He also argues that the denial of a new trial
was an abuse of discretion, whether in the interest of justice or to simply
correct mistakes.   He fails, however, to
link either the Ainterest of justice@ or the trial court=s alleged mistakes to consideration of the additional
evidence.  Accordingly, we find this
issue has been waived.  See Tex. R. App. P. 38.1(h) (stating that Abrief
must contain a clear and concise argument for the contentions made, with
appropriate citations to authorities and to the record@);
Seminole Pipeline Co. v. Broad Leaf Partners, Inc., 979 S.W.2d 730, 758 (Tex. App.CHouston [14th Dist.] 1998, no pet.).

Moreover,
nothing in the record requires us to consider the additional evidence even if
McMahan had properly briefed his arguments. 
Generally, a party may not rely on new evidence in a motion for new
trial without showing that the evidence was newly discovered and could not have
been discovered through due diligence prior to the ruling on a summary judgment
motion. Risner v. McDonald=s Corp., 18 S.W.3d
903, 909 (Tex. App.CBeaumont 2000, pet. denied); Longoria v. United Blood Servs.,
907 S.W.2d 605, 609 (Tex. App.CCorpus Christi
1995), rev=d on other grounds,
938 S.W.2d 29 (Tex. 1997).  McMahan
does not argue, either in his motion or his appellate briefs, that the evidence
attached to his motion for new trial was newly discovered and could not have
been discovered through due diligence prior to the trial court=s
ruling.  See Risner, 18 S.W.3d
at 909; Longoria, 907 S.W.2d at 609.








At least one
court has held that if a trial court indicates it considered new evidence
attached to a motion for new trial, a reviewing appellate court should also
consider that evidence.  See Oryx
Energy Co. v. Union Nat=l Bank, 895 S.W.2d
409, 412 n.3 (Tex. App.CSan Antonio 1995, writ denied). 
However, the record here does not affirmatively demonstrate that the
trial court considered the new evidence or that McMahan requested leave of
court to file additional evidence.  See
id. (noting that trial court gave leave to file motion with additional
evidence).  In its order denying the motion
for new trial, the court states it considered the motion, all responses, and
argument of counsel, but does not state it considered the evidence attached to
the motion.  Indeed, both Henderson and
the Greenwood defendants= in their responses to the motion argued that the court could
not consider the evidence.  The court may
well have agreed with those arguments and declined to review the evidence.  Although the record does contain an earlier
order denying Henderson=s motion to strike the exhibits attached to the motion for new
trial, this is not tantamount to either leave of court to file additional
evidence or an indication the court considered the new evidence.  We find no basis in the record to compel a
review of the evidence attached to the motion for new trial, and overrule the
fourth issue.

                                                   VII.  Sanctions

In his response
brief, Henderson characterizes McMahan=s appeal as frivolous and requests that we impose sanctions
against him under Rule 45 of the Texas Rules of Appellate Procedure.  Whether to grant sanctions is a matter of
discretion that we exercise with prudence and caution and only after careful
deliberation and in truly egregious circumstances.  Angelou v. African Overseas Union, 33
S.W.3d 269, 282 (Tex.
App.CHouston [14th Dist.] 2000, no pet.).  Because
we have found merit in some of McMahan=s arguments, we hold that the appeal was not frivolous and deny
the request for sanctions.

VIII.  Conclusion

We affirm the
summary judgment granted in favor of the Greenwood defendants and affirm in
part, reverse in part, and remand for further proceedings the judgment favoring
Henderson.  Specifically, on remand,
McMahan may continue to pursue his fraud, fraudulent inducement, legal
malpractice, breach of fiduciary duty, negligent representation, and conspiracy
causes of action against Henderson, but not his claims on conversion, concert
of action, contract, or duress.

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion on Rehearing filed May 29, 2003.

Panel consists of Justices Seymore, Guzman, and Draughn.[12]

 











[1]  The Greenwood
defendants contend McMahan himself ordered the reversals because of potential
tax consequences.  McMahan contends he
did not become aware of the reversals until they were mentioned in a deposition
in the present lawsuit. 





[2]  In his brief,
McMahan includes a long list of allegedly fraudulent conduct; however, these
two are the only specific claims he arguably articulates with respect to
fraudulent inducement of the settlement agreement.  Both claims are also related to his
underlying fraud claim.





[3]  In his Motion
for Rehearing, McMahan contends that the executed Buy-Sell Agreement evidences
his exercise of the option.  He reasons
that because the Stock Option Agreement stated he would execute a Buy-Sell
Agreement upon exercise of the option, and he did in fact execute a Buy-Sell
Agreement, the record reflects his entitlement to the 700 shares of stock.  However, both the Stock Option Agreement and
the Buy-Sell Agreement were executed on April 1, 1989, and as McMahan has
stated, he did not contribute the assets triggering the stock option until
early 1990.  Thus, the Buy-Sell Agreement
executed in 1989 does not evidence his exercise of the option in 1990.  





[4]  Williamson
testified she made the reversals at McMahan=s
direction.  This testimony is supported
by the testimony of Howard Greenwood, and by that of John Eagleson, Fine Rides= accountant.





[5]  When it ruled
on Henderson=s motion for summary judgment, the trial court did not
have before it the affidavit Henderson attached in conjunction with the
later-filed Greenwood defendants= motion
for summary judgment.  Accordingly, on
appeal, we cannot consider the statements in that affidavit because it was
filed as summary judgment evidence only with the Greenwood defendants= motion.  See
Medlock, 24 S.W.3d at 871. 





[6]  Henderson also
attacked a breach of contract claim in his motion, but McMahan did not include
such a claim in his list nor did he make any arguments regarding it in his
brief.  Consequently, to the extent there
was such a cause of action raised in the pleadings, it has been abandoned on
appeal.  See
Cuyler, 60 S.W.3d
at 216.





[7]  See Woolsey
v. Nationwide Ins. Co., 884 F.2d 381, 384 (8th Cir. 1989) (noting Athe terms >personal
representative= and >legal representative=
generally mean the executor or administrator of a deceased person@); Reed v. American‑German Nat'l Bank,
155 F. 233, 236 (C. C. W.D. Ky. 1907) (noting that A[t]he terms >legal
representative= and >personal representative,= in
their commonly accepted sense, mean administrator or executor@ although its usage may also include Aheirs, next of kin, or descendants, and sometimes
assignees or grantees.@); Young v. Firemen's Ins. Co. of Washington, D.C.,
463 A.2d 675, 676 (D.C. 1983) (noting that A[i]t
appears to be uniformly held that where the language or the circumstances
surrounding the parties thereto do not indicate a different intention, the term
>legal representative= must be
given its primary legal meaning of executor or administrator.@); Pullen v. Cincinnati Ins. Co., 400 So.2d
393, 401 (Ala. 1981) (AThe term >legal
representative= is one having a well‑defined legal meaning, its
>primary meaning= being
executors or administrators.@); Hill v. James, 175 So.2d 176, 179 (Miss.
1965) (AEither of these preceding words, >administrator= or >executor= refers
to the legal representative of an estate, and though the method of appointment
as to each might differ, one by law and the other by will, each signifies a
representative capacity as distinguished from an individual capacity.@); Lewis v. King, 141 S.E. 909, 910 (Ga. 1928)
(noting A[t]he power conferred upon the >legal representative= of the
grantee should be construed as conference of power upon an executor or
administrator of the grantee.@); Conley v. Jamison, 219 N.W. 485, 486 (Iowa
1928) (AThe great weight of authority we have found on this
subject defines the phrase >legal representatives= as
ordinarily meaning executors or administrators when not qualified by the
context@ and that Athe
numerous cases that [the court] investigated on this question are the following
which seem with one voice to hold that the phrase >lawful representatives= is
limited to executors and administrators.@); Larkins
v. Routson, 155 N.E. 227, 230 (Ohio 1927) (noting that Aresearch of the authorities as to the definition of
the phrase >legal representatives=
discloses a number of meanings, such as, administrators or executors, assignee
or grantee, trustee@); Page v. Metro. Life Ins. Co., 135 S.W. 911,
912 (Ark. 1911) (noting that when the term legal representative is used in Aany legal instrument@ without
any other context, the Awell recognized@ meaning
executor or administrator should be applied.); Kelsay v. Eaton, 76 P.
770, 772 (Or. 1904) (noting that A[t]he
phrase >legal representatives= in its
ordinary acceptation means executors and administrators@ although it might include Aheirs, next of kin, or descendants@); Sullivan v. Louisville & N.R. Co., 30
So. 528, 533B34 (Ala. 1901) (noting that the term Alegal representative@ has a Awell‑defined legal meaning@ and that its Aprimary
meaning@ was executor or administrator); Allen v. Stovall,
63 S.W. 863, 865 (Tex. 1901) (AThe signification of the word [Arepresentative@] is
broad enough to embrace both executors and administrators C the personal representatives, as known to the common
law C and also the heir, who, under that law, occupied the
place of the ancestor as to the real estate, and represented him as to such
property.@); Griswold v. Sawyer, 26 N. E.
464, 465 (N.Y. 1891) (AIt is undoubtedly true that the strict, technical prima
facie meaning of [the phrase >legal
representatives=] is administrators or executors, and that they must
always have that meaning, unless it can be seen that they were used in a
different sense.@) (emphasis in original); Cox v. Curwen, 118
Mass. 198, 200 (Mass. 1875) (AIt is admitted that the ordinary meaning of the words >legal representatives= is >executors and administrators.=@); Warnecke v. Lembca, 71 Ill. 91 (Ill. 1873) (ALegal representative, or personal representative, in
the commonly accepted sense, means administrator or executor@ but Amay mean heirs, next of kin or descendants.@).





[8]  Courts often
rely upon the persuasive authority of Black=s Law
Dictionary in statutory or contract construction.  See, e.g, Buckhannon Bd. & Care Home,
Inc. v. West Virginia Dep=t
of Health and Human Res., 532 U.S.
598, 603 (2001) (relying on the Black=s Law
Dictionary definition of the statutory term Aprevailing
party@).  We are not
the first court to rely upon Black=s Law
Dictionary to interpret the term Alegal
representative.@  See, e.g.,
Agae v. United States, 125 F. Supp.2d 1243, 1248 (D. Haw. 2000); Forbes
v. Am. Int=l. Ins. Co.,
271 A.2d 684, 686B87 (Md. 1970); Wills v. De Kalb Area Ret. Ctr.,
530 N.E.2d 1066, 1070 (Ill. App. Ct. 1988). 





[9]  See, e.g.,
Walters v. Nat=l Ass=n
of Radiation Survivors, 473 U.S. 305,
371 n.22 (1985) (Stevens, J., dissenting) (AThe
statute, moreover, on the one hand, recognizes and allows legal representation,
but on the other hand restricts the veteran's right to choose and to consult a
legal representative in any meaningful manner, thus virtually reducing the
right to counsel to nonexistence.@); United
States v. Kaczynski, 239 F.3d 1108, 1121 (9th Cir. 2001) (Reinhardt, J.,
dissenting) (AAll three are superb attorneys, and [appellant] could
not have had more able legal representatives.@); Ex
parte Lockhart, 868 S.W.2d 346, 349 (Tex. Crim. App. 1993) (noting that
Texas Resource Center attorneys Afiled
the defendant=s >pro‑se=
application for stay and other related motions, acting at all times as his
legal representative@); Employers Cas. Co. v. Tilley, 496 S.W.2d
552, 558 (Tex. 1973) (noting that under an insurance policy in question the Aattorney becomes the attorney of record and the legal
representative of the insured, and as such he owes the insured the same type of
unqualified loyalty as if he had been originally employed by the insured@); Dow Chem. Co. v. Benton, 357 S.W.2d 565, 568
(Tex. 1962) (AIf we were to adopt respondents= position in the present case, the effect would be
that an attorney is no longer merely the legal representative of his client.@)





[10]  Henderson
argues that because McMahan alleged the existence of an attorney-client
relationship, all of his claims are subsumed under the malpractice claim,
citing Dear v. Scottsdale Ins. Co., 947 S.W.2d 908, 917 (Tex. App.CDallas 1997, writ denied) (holding that legal
malpractice claims are governed by the two-year statute no matter how
characterized), and thus governed by the two-year statute of limitations rather
than the four-year statutes applicable to contract claims.  McMahan=s
pleadings appear to raise alternate claims based on both the existence and
absence of an attorney-client relationship. 
We recently noted that the rule against dividing or fracturing a
negligence claim prevents legal-malpractice plaintiffs from opportunistically transforming
a claim that sounds only in negligence into other claims.  See Deutsch v. Hoover, Bax & Slovacek,
L.L.P, 97 S.W.3d 179, 189B90 (Tex. App.CHouston
[14th Dist.] 2002, no pet h.).  However,
this rule does not prohibit a client from suing his attorney on a claim other
than negligence.  See id. at
189.  Regardless, we need not define the
precise parameters of McMahan=s lawsuit because we find, as discussed above, that
Henderson has not conclusively proven his limitations argument.





[11]  In analyzing
the fiduciary nature of the attorney-client relationship, the Texas Supreme
Court has observed:

 

As a fiduciary, an attorney is obligated to render a
full and fair disclosure of facts material to the client=s representation. 
The client must feel free to rely on his attorney=s advice.  Facts
which might ordinarily require investigation likely may not excite suspicion
where a fiduciary relationship is involved. 
Further, breach of the duty to disclose is tantamount to concealment.

 

Willis v. Maverick, 760 S.W.2d 642, 645 (Tex. 1988) (citations omitted).





[12]  Senior Justice
Joe L. Draughn sitting by assignment.